IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY CARPENTER | : | |
| | : | |
| PLAINTIFF | : | |
| | : | 3:CV-03-0399 |
| VS. | : | (CHIEF JUDGE VANASKIE) |
| | : | |
| PROCTOR & GAMBLE DISABILITY | : | |
| BENEFIT PLAN & BENEFIT PLANS | : | |
| TRUST | : | |
| DEFENDANT | : | |

MEMORANDUM

Plaintiff Gary Carpenter commenced this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq., to recover long-term disability benefits he claims were due to him under the Procter & Gamble Long-Term Disability Allowance ("LTDA") Plan.  The Trustees of the plan terminated Mr. Carpenter's disability benefits after determining he was not totally disabled as required by the plan.  Mr. Carpenter asks this Court to overturn the Trustees' decision.  Before this Court are the parties' cross-motions for summary judgment.  (Dkt. Entries 50, 52.)

Because the LTDA Plan accords the Trustees discretionary authority to determine eligibility for Plan benefits, this Court reviews the Trustees' determination that Mr. Carpenter is not eligible for benefits under an arbitrary and capricious standard of review.  Slightly heightened scrutiny of the benefits decision is warranted in this case, however, because the

Procter and Gamble Company ("P&G") both funds and administers the LTDA Plan.

Nonetheless, the record contains sufficient evidence to sustain the Trustees' decision.

## I.  PROCEDURAL HISTORY

On March 5, 2003, Mr. Carpenter this action.  (Dkt. Entry 1-1.)  The case was referred to

Magistrate Judge Mannion for pretrial management. (See Dkt. Entry 3.)

On November 14, 2003, the parties' filed cross-motions for summary judgment.  (Dkt.

Entries 10-1, 11-1.)  In a Report and Recommendation dated July 14, 2004, Magistrate Judge

Mannion proposed that the Court sustain the Trustees' decision to terminate Mr. Carpenter's

benefits.  (Dkt. Entry 20.)

Mr. Carpenter filed  objections to Magistrate Judge Mannion's Report and

Recommendation on July 27, 2004.  (Dkt. Entry 21-1.)  Before this Court addressed Mr.

Carpenter's objection, Defendant moved to supplement the record with additional information

regarding the structure and funding of the LTDA Plan.  (Dkt. Entry 22-1.)  This Court granted

Defendant's motion and determined that a decision on the parties' cross-motions for summary

judgment was inappropriate given that the record was still developing.  (Dkt. Entry 30.)

On April 29, 2005, the parties renewed their cross-motions for summary judgment.  (Dkt.

Entries 50, 52-1.)  The motions have been fully briefed and are now ripe for resolution.

## II.  BACKGROUND

Plaintiff John Carpenter began working for the P&G at its Mehoopany Plant on

September 12, 1977.  (Plaintiff's Statement of Material Facts ("SMF") (Dkt. Entry 51-2) ¶ 1.)  In

1990, Mr. Carpenter underwent a total hip replacement.  (Id. ¶ 2.)  In 1997, a Rheumatologist,

Marianne J. Santioni, D.O., diagnosed Mr. Carpenter as suffering from Rheumatoid Arthritis and

Osteoporosis.[1]  (Id. ¶ 3.)  Mr. Carpenter's condition prohibited him from working at P&G

beginning on June 8, 1998.  (Id. ¶ 4.)  At that time, Mr. Carpenter was a participant in an

ERISA-covered disability plan sponsored by P&G.  (Def.'s SMF (Dkt. Entry 52-2) ¶ 4.)

## A.  P&G's Disability Plan

P&G's disability plan includes both a short-term benefits plan, the P&G Disability Benefit

Plan ("Short-Term Plan"), and a long-term benefits plan, the LTDA Plan.  (See The P&G

Disability Benefit Plan ("Plan Document") (Dkt. Entry 12-1, Ex. A) at 17.)  Plan participants

initially receive benefits for the first fifty-two (52) weeks of disability under the Short-Term Plan.

(See id.)  After fifty-two (52) weeks of total disability, benefits are governed by the LTDA Plan.

(See id.)

A participant must be totally disabled to receive benefits under the LTDA Plan.  (Id.)

"Total disability" is defined as "a mental or physical condition resulting from illness or injury

---

[1] Rheumatoid Arthritis is "a chronic systemic disease primarily of the joints, usually
polyarticular, marked by inflammatory changes in the synovial membranes and articular
structures and by muscle atrophy and rarefaction of the bones.  In late stages deformity and
ankylosis develop.  The cause is unknown, but autoimmune mechanisms and virus infection
have been postulated."  DORLANDS'S ILLUSTRATED MEDICAL DICTIONARY 156 (30th ed. 2003).
Osteoporosis is "a rare genetic disease characterized by abnormally dense bone, due to
defective resorption of immature bone."  Id. at 1336.

which is generally considered totally disabling by the medical profession.  Usually, total disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home."  (Id. art. II, § 16.)[2]  The plan defines "partial disability" as "a mental or physical condition resulting from an illness or injury because of which the Participant cannot perform regular duties but can perform other useful duties."  (Id. art. II, § 11.)

The LTDA Plan is administered by two company-appointed Trustees.  The Trustees are vested with discretionary authority to interpret the plan and to make disability benefit determinations.  (Id. art. VII, § 1(h).)  The Trustees are volunteers who work in other jobs with P&G and receive no additional pay for their Trustee-related duties.  (Id. art. VII, § 1(f); Tr. of Hoffman's Dec. 7, 2004 Dep. ("Hoffman Dep. I") (Dkt. Entry 54) at 14-15.)

The Trustees may establish three-person review board to conduct an initial investigation and recommendation concerning a participant's entitlement to benefits.  (Plan Document, art. VIII, §§ 2-4.)  Members of the review board work in other positions at P&G and receive no additional pay for their review board-related activities.  (Hoffman Dep. I at 28.)  P&G also employs medical case managers to provide medical reviews for the reviewing boards and the Trustees.  (Id. at 23-24.)

---

[2] This definition, as well as other definitions and terms set forth in this opinion, is from the Short-Term Plan.  The LTDA plan adopts the terms and definitions of the Short-Term Plan.  Id. at 17.

4

The Trustees may require participants receiving benefits under the plan to undergo an examination by a physician of its choice.  (Id. art. VI, § 6(d).)  If the examination shows that the participant is no longer totally disabled, benefits may be discontinued.  (Id.)

Benefits under the LTDA plan are paid out of a trust fund.  (Hoffman Dep. I at 16-17.) P&G makes contributions to the trust fund based upon estimates of the current year's claim liability, the estimated future long-term disability benefits, and the investment return of the fund. (Id.)  An actuarial determination of unrevealed claims and future liabilities is used to estimate future long-term benefits.  (Id. at 35-36.)  If the trust fund lacks sufficient money to pay benefits, P&G must make up the deficiency.  (Id. at 16.)

## B.  Mr. Carpenter's Disability Claim

On June 10, 1998, Mr. Carpenter applied for benefits under the Short-Term Plan. (Administrative File ("AF") (Dkt. Entry 12-1, Ex. C) at 188-89.)[3]  The application was supported by a physician's certificate stating that Mr. Carpenter was totally disabled.  (Id. at 189.)  Mr. Carpenter received total disability benefits under the Short-Term Plan from June 1998 until June 1999.  (Pl.'s S.M.F. (Dkt. Entry 51-2) ¶ 6.)

On June 21, 1999, Mr. Carpenter began receiving disability benefits under the LTDA Plan.  (AF (Dkt. Entry 12-1, Ex. C) at 208.)  Mr. Carpenter's eligibility for total disability benefits

---

[3]  The Administrative File bears in sequential order Bates numbers P&G/CARPEN 000001 through 000215.  The citation here will omit leading zero digits.

was supported by his treating physician, Dr. Santioni, who submitted numerous status reports and certificates stating that Mr. Carpenter was totally and permanently incapacitated.[4]  (See, e.g., id. at 18, 20, 75, 77, 85, 87, 89, 92, 99, 101, 105, 113, 115, 117, 119, 149, 197.)  Dr. Santioni also submitted functional capacity statements indicating Mr. Carpenter's ability to perform specific activities, such as sitting, walking, twisting, and using his hands for grasping. (See, e.g., id. at 19, 21, 76, 84, 86, 90, 92, 98, 100, 106, 114, 116, 118, 120, 150, 198.)

In December 1999, Mr. Carpenter was awarded Social Security disability insurance benefits, retroactive to December 1998.  (Id. at 196.)  In accordance with the provisions of the P&G Disability Benefits Plan, Mr. Carpenter's disability payments were reduced by the social security payments.  (Id.)

In a letter dated February 1, 2002, the Mehoopany Disability Reviewing Board requested that Mr. Carpenter participate in a Functional Capacity Evaluation ("FCE") to assess his medical status.  (Id. at 49.)  A certified evaluator conducted the FCE on February 11, 2002.  (Id. at 47.) The evaluation indicated that over an eight-hour shift Mr. Carpenter could occasionally (1-33%) sit, stand, walk, bend, reach, squat, kneel, crawl, climb, and use his hands for simple grasping, fine work, pushing, pulling, and low speed assembly.  (Id.)  A medical doctor reviewed the

---

[4]  In a December 10, 1998 Physician's Statement, Dr. Santioni indicated that Mr. Carpenter may be capable of performing sedentary work based on his improved health after taking new medication.  (Id. at 159.)  The following month, Dr. Santioni again diagnosed Mr. Carpenter as totally disabled, noting his overall prognosis was poor.  (Id. at 158.)

results and determined that "Mr. Carpenter's preferred level of functional ability is most

consistent with the **Light** Physical Demand Level for **an 8-hour** day according to the <u>Dictionary</u>

<u>of Occupational Titles</u>, U.S. Department of Labor, 1991."[5] (<u>Id</u>. at 45) (emphasis in original.)  The

FCE results were deemed reliable based on the excellent effort put forth by Mr. Carpenter and

the lack of symptom exaggeration.  (<u>Id</u>.)

   After reviewing the FCE, Brenda Tocket, R.N., Medical Review Officer for the

Mehoopany Reviewing Board, recommended partial disability for Mr. Carpenter on March 8,

2002. (<u>Id</u>. at 14.)  In a March 11, 2002 letter to the Board of Trustees of the LTDA Plan, the

Mehoopany Reviewing Board recommended that Mr. Carpenter be classified as partially

disabled based on the FCE and Ms. Tocket's review.  (<u>Id</u>. at 31.)

   On April 30, 2002, the Trustees determined that Mr. Carpenter was partially disabled as

defined by the P&G Disability Benefits Plan.  (<u>Id</u>. at 29.)  The Trustees provided the following

explanation for their decision:

> On the basis of a Functional Capacity Evaluation, performed by Dr.
> John Kline, Jr., Mr. Carpenter can return to work with the following
> restrictions of occasional sitting, standing, walking, bending,
> reaching, squatting, kneeling, crawling, and stair climbing.  As
> such, Mr. Carpenter is partially disabled as that term is defined in
> the Plan.

---

[5]  According to the FCE worksheet, the Light Physical Demand Classification means that
the worker can occasionally (1-33%) handle objects weighing up to 20 pounds, frequently (34-
66%) handle objects weighing up to 10 pounds, and constantly (67-100%) handle objects of
handle objects of negligible weight.  (<u>Id</u>.)

(Id.)  Consequently, Mr. Carpenter was not eligible for total disability benefits under the LTDA Plan.  (Id. at 29-30.)  He was instead paid partial disability benefits retroactive to the February 11, 2002 FCE.[6]  (Id.)

Mr. Carpenter, through counsel, appealed the Trustees' determination of partial disability.  (Id. at 6).  Mr. Carpenter supported his appeal with medical documents from Dr. Santioni, including: (1) a December 28, 2001 report stating her opinion that Mr. Carpenter was totally and permanently incapacitated; (2) a patient's capabilities evaluation dated December 28, 2001, indicating that Mr. Carpenter was capable of spending 1% to 33% of a work day sitting, standing, walking, bending, twisting, squatting, kneeling, crawling, lifting ten (10) pounds or less, and using his hands for keyboarding and grasping; (3) letters to Mr. Carpenter's personal physician setting forth her course of treatment;[7] and (4) a prescription for Vicodin.  (Id. at 8-13.)

On September 11, 2002, Ms. Tocket considered Mr. Carpenter's appeal, and recommended that the partial disability determination be upheld. (Id. at 4.)  In her assessment,

---

[6]  A plan participant may receive up to 52 weeks of partial disability benefits during their lifetime under the P&G Disability Benefits Plan.  (Id.; see also Plan Document (Dkt. Entry 12-1, Ex. A) art. VII.)

[7]  In the letters, Dr. Santioni indicated that Mr. Carpenter's rheumatoid arthritis was stable, though he continued to suffer from "chronic pain, especially in his ankles, from joint damage secondary to his rheumatoid arthritis." (Id. at 9, 11.)  Dr. Santioni also noted that Mr. Carpenter was taking Enbrel, Vioxx, Prednisone, Fosamax, and a Calcium supplement with Vitamin D.  (Id.)

Mr. Carpenter failed to present evidence showing that the previous partial disability determination was wrong.  (Id.)  The Mehoopany Reviewing Board concurred with Ms. Tocket's recommendation.  (Id. at 7.)

On October 7, 2002, the Board of Trustees denied Mr. Carpenter's appeal. (Id. at 1-3). The Board of Trustees reviewed the documents submitted by Mr. Carpenter with his appeal, as well as his medical record.  (Id. 1-2.)  The Board found that there was no objective medical evidence indicating that Mr. Carpenter was unable to perform useful duties.  (Id. at 2.)  The Board again concluded that the results of Dr. Kline's "independent" FCE "indicate that Mr. Carpenter's preferred level of functional ability is most consistent with the light physical demand for an eight-hour day.  As such, Mr. Carpenter is partially disabled as the term is defined in the Plan."  (Id. at 1)(emphasis in the original.)  In addition, the Board of Trustees noted that Dr. Santioni had indicated "in several documented conversations that Mr. Carpenter could potentially return to light duty work."  (Id. at 2.)  Mr. Carpenter then brought this action.

## III.  STANDARD OF REVIEW

### A.  Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56©.  A fact is "material" if proof of its existence or nonexistence

9

might affect the outcome of the suit under the applicable law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id</u>.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party.  <u>Cont'l Ins. Co. v. Bodie</u>, 682 F.2d 436, 438 (3d Cir. 1982).  The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor.  <u>Anderson</u>, 477 U.S. at 256-57.

## B.  ERISA Standard

Mr. Carpenter initiated this action against the P&G Disability Benefits Plan to recover his long-term disability benefits under 29 U.S.C. § 1132(a)(1)(B).[8]  In <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989), the Supreme Court held that a "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a <u>de</u> <u>novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  When the language of a plan governed by ERISA accords the administrator discretionary authority to determine eligibility for benefits, judicial

---

[8] Section 1132(a)(1)(B) authorizes a benefit plan participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

review of a decision to deny benefits is limited to ascertaining whether the denial is arbitrary and capricious.[9]   See Vitale v. Latrobe Area Hosp., 420 F.3d 278, 281-82 (3d Cir. 2005); Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 44-45 (3d Cir. 1993).   Under this standard, an administrator's decision "will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Vitale, 420 F.3d at 282 (quoting Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000)).

Where, however, an administrator with discretionary authority to decide eligibility for benefits is burdened by a conflict of interest, "that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'"  Firestone Tire & Rubber Co., 489 U.S. at 115 (quoting RESTATEMENT (SECOND) OF TRUSTS § 187, cmt. d (1959)).  In Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000), our Court of Appeals interpreted Firestone Tire to require heightened review of "discretionary decisions in situations where the impartiality of the administrator is called into question, either because the structure of the plan itself inherently creates a conflict of interest, or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case."  Goldstein v. Johnson & Johnson, 251 F.3d 433, 435-36 (3d Cir. 2001).  This "heightened form or review is to be formulated on a

---

[9] "The 'arbitrary and capricious standard' is essentially the same as the 'abuse of discretion' standard."   Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 n.4 (3d Cir. 1993).

sliding scale basis" reflecting the degree of conflict.  Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004).

In this case, there is no dispute that benefits determinations are committed to the discretion of the Plan's Trustees.  Thus, de novo review is inappropriate.  The question here is whether the impartiality of the administrators of the LTDA Plan is called into question to warrant a more intense level of review than the deferential arbitrary and capricious standard.

Our Court of Appeals has made a distinction between employer-funded plans that are actuarially grounded and plans that are funded on a case-by-case basis.  See Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 174 (3d Cir. 2001).  An actuarially grounded plan, "with the company making fixed contributions to the pension fund, and a provision requiring that the money paid into the fund may be used only for maintaining the fund and paying out pensions," generally does not trigger the sort of conflicts of interest requiring a heightened form of review.  Pinto, 214 F.3d at 388; see also Vitale, 420 F.3d at 282.  This is because "the employer in such a circumstance 'incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits.'"  Pinto, 214 F.3d at 388 (quoting Abnathya, 2 F.3d at 45 n.5, and Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 n.4 (3d Cir. 1997)).  In contrast, an employer-fiduciary may be subject to a conflict of interest when administering a plan funded on a case-by-case basis, because benefits are paid "out of operating funds rather than from a separate ERISA trust fund."  Vitale, 420 F.3d at 282.

12

Defendant supplemented the record with the deposition of the Chairman of the Board of Trustees for the LTDA Plan, Curt Hoffman, detailing the structure of the LTDA Plan.  According to Mr. Hoffman, benefits under the LTDA plan are paid out of a trust fund.  P&G makes contributions to the trust fund based upon estimates of the current year's claim liability, the estimated future long-term disability benefits, and the investment return of the fund.[10]  An actuarial determination of unrevealed claims and future liabilities is used to estimate future long-term benefits.  P&G guarantees the liquidity of the trust fund and there is no evidence that P&G may take money out of the fund.

Based on this evidence, it does not appear that the LTDA Plan is strictly funded on a case-by-case basis to warrant heightened scrutiny.  Nor does it appear, however, that P&G makes fixed actuarially grounded contributions to the fund.  Instead, P&G merely considers the actuarially based estimates of plan costs in determining contributions.  Thus, P&G could potentially reduce its contributions to the fund if actual disability payments under the Plan were reduced.  Thus, a potential conflict of interest exists for the P&G-appointed Trustees to reduce

---

[10]  The LTDA plan had assets of $26,316,060 as of June 30, 2001, and $19,807,817 as of June 30, 2002.  (See Ex. 2, Hoffman Dep. I.)  The payments for plan participants for the year ending June 30, 2001 was $6,588,753 and for the year ending June 30, 2002 was $7,888,492.  (Id.)  The current and estimated future liabilities of the fund as of June 30, 2001 totaled $37,661,238 (of which $521,998 was classified as currently payable) and as of June 30, 2002 was $42,133,029 (of which $606,357 was classified as currently payable).  (Id.)  The fund's total investment income for the year ending June 30, 2001 was $2,927,425, and for the year ending June 30, 2002 was $1,730,072.  (Id.)  P&G made no contributions to the fund in 2001 or 2002.  (Id.)

13

the actual disability payments under the plan by applying a stricter standard to disability claims.

Therefore, a highly deferential standard does not seem appropriate in this case.[11]  See Vitale,

420 F.3d at 282 (finding deference appropriate where "contributions to the fund are determined

by an actuarial formula and are not directly influenced by individual benefits decisions"); Pinto,

214 F.3d at 388 (noting that deference is appropriate when an employer makes "fixed"

contributions determined by an actuarial formula).

    The potential conflict of interest for the Trustees, though, is slight.  The Trustees for the

LTDA Plan are employees of P&G and, presumably, also potential participants under the LTDA

Plan.  This would seem to indicate that the Trustees have an affinity towards employees and an

interest in promoting plan benefits.  In contrast, reducing disability benefits would provide little

benefit to the Trustees.  Because the Trustees are not paid for their work, they have little

incentive to please P&G in order to keep their positions.  It should be noted, however, that a

Trustee may have a slight interest in pleasing P&G in order to gain support for promotion.

Overall, though, the Trustees appear to have a mild, if any, bias towards promoting P&G's

---

[11] It should also be noted that the Board of Trustees may also have lacked the typical check against self-interest of wanting to maintain employee satisfaction.  See Pinto, 214 F.3d at 386 (noting that the inherent conflict that exists when a company both funds and administers a plan may be lessened when "the employer had incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits").  Mr. Carpenter had not worked at P&G for nearly four (4) years when his LTDA benefits were terminated.  Moreover, he was not offered a position to return to the company.  Thus, the termination of Mr. Carpenter's LTDA benefits was unlikely to have any effect on overall employee satisfaction at P&G.

interests over the interests of plan participants.

The fact that the P&G Disability Benefits Plan uses independent third parties to perform medical evaluations also decreases concerns that the Trustees' decision was based on a conflict of interest.  In Grossman v. Wachovia Corp., No. Civ.A. 04-3701, 2005 WL 2396793 (E.D. Pa. Sept. 27, 2005), the Court considered a plan where benefit payments could potentially come from the company's general assets and a company administrator made benefit determinations.  The District Court held that the use of independent third parties to initially review disability claims decreased concerns that the administrator's decision was based on a conflict of interest.  Id at *8; see also Pinto, 214 F.3d at 383 (stating that a conflict of interest typically does not exist when the employer funds a plan and pays "an independent third party to interpret the plan and make plan benefits determinations").

In addition, our Court of Appeals has suggested that conflict of interest concerns are diminished when the amount in controversy is relatively low compared to the assets of the plan. See Pinto, 214 F.3d at 386.  In the present case, Mr. Carpenter's disability payments totaled $5,532 per year,[12] which is relatively insignificant compared to the $19,807,817 in plan assets and the $7,887,492 in plan payments made in 2002, when the decision was made to terminate Mr. Carpenter's benefits.  Of course, a court must be wary of giving too much weight to this

---

[12] Mr. Carpenter received $1,310 per month in disability benefits, of which $461 was paid by the LTDA Plan and the rest was paid by the Social Security Administration.  (AF (Dkt. Entry 12-3) at 196.)

factor, as every claimant's disability payment is relatively insignificant compared to the aggregate.  Nonetheless, it does decrease concerns that the Trustees' decision was based on a conflict of interest.

Consideration of all these factors compels the conclusion that a slightly heightened arbitrary and capricious standard of review is appropriate for the Trustees' decision to terminate Mr. Carpenter's long-term disability benefits.  As noted by Our Court of Appeals, however, application of this standard can be difficult because "it is not clear how to employ a slightly heightened form of the arbitrary and capricious standard."  Stratton, 363 F.3d at 255.  A Court is advised to "apply the arbitrary and capricious standard, and integrate conflicts as factors in applying that standard, approximately calibrating the intensity of [the] review to the intensity of the conflict."  Id.

## IV.  ANALYSIS

Mr. Carpenter's benefits under the LTDA Plan were terminated after the plan Trustees determined that he was not totally disabled as required by the plan.  The Trustees' decision was based primarily on an independent functional capacities evaluation ("FCE"),[13] concluding that Mr. Carpenter was capable of performing at a light physical demand level for an eight-hour day.

Initially, Mr. Carpenter argues that the Trustees had to present evidence showing that his

---

[13]  It should be noted that the FCE was paid for by the P&G Disability Benefits Plan.  The certified evaluator and medical doctor who reviewed the results, however, were independent third parties.

16

condition improved between the time the Trustees initially found him totally disabled in 1999 and the time they found him partially disabled in 2002.  (Pl.'s Br. in Opp. to Def.'s Mot. Summ. J. (Dkt. Entry 56-1) at 11.)  The Fifth Circuit denied a similar argument in <u>Ellis v. Liberty Life Assurance Company of Boston</u>, 394 F.3d. 262 (5th Cir. 2004), holding:

> [W]hen a plan fiduciary initially determines that a covered employee is eligible for benefits and later determines that the employee is not, or has ceased to be, eligible for those benefits by virtue of additional medical information received, the plan fiduciary is not required to obtain proof that a substantial change in the [long-term disability] recipient's medical condition occurred after the initial determination of eligibility. . . .  A contrary holding would basically prohibit a plan fiduciary from ever terminating benefits if it later discovered evidence that the ERISA plaintiff was not disabled at the time of the initial grant of benefits.

<u>Id</u>. at 274 (emphasis in original omitted).  I find the Court's reasoning persuasive.

In this case, the Trustees initially determined that Mr. Carpenter was totally disabled based on the opinion of his treating physician, Dr. Santioni.  Significantly, Dr. Santioni also submitted numerous functional capacity statements indicating that Mr. Carpenter could at least occasionally perform some activities, such as sitting, walking, and using his hands for grasping.

In 2002, the Trustees exercised their discretion to require Mr. Carpenter to participate in an independent FCE to assess his condition.  A certified evaluator and a medical doctor reviewed the results of the FCE and concluded that Mr. Carpenter was capable of performing at a light physical demand level for an eight-hour work day.

The Trustees properly considered this new evidence to assess whether Mr. Carpenter

should receive benefits under the LTDA Plan.  Though the Trustees may not have been presented with evidence that Mr. Carpenter's condition improved, they did receive new evidence that he was capable of performing some useful duties and, therefore, was not totally disabled.  The Trustees thus had a rational basis for their determination that Mr. Carpenter's disability was not "total."

Mr. Carpenter argues that the Trustees failed to give appropriate weight to the opinion of his treating physician.  This case principally involves a difference of opinion among medical experts regarding the degree of Mr. Carpenter's disability.[14]  The Trustees ultimately accepted the medical opinion expressed in the 2002 FCE that Mr. Carpenter was not totally disabled.  The question before this Court is whether the Trustees' decision was arbitrary and capricious, considering any conflicts of interest involved in the decision.

Our Court of Appeals confronted a similar situation in Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250 (3d Cir. 2004), where administrators of a health plan refused to repay the medical expenses incurred for a surgical procedure recommended by the plan participant's treating physician, but not by the plan's doctors.  Id. at 252-53.  The Court denied the plan participant's appeal, noting that "'[a] professional disagreement does not amount to an arbitrary refusal to credit" the plan participant's doctor.  Id. at 258.  The Court cited Black &

---

[14]  There is no dispute among the parties that Mr. Carpenter suffers from Rheumatoid Arthritis and Osteoporosis.

Decker Disability Plan v. Nord, 538 U.S. 822 (2003), which addresses a plan administrators'

obligations when confronted with differing medical evidence:

> Plan administrators, of course, may not arbitrarily refuse to credit a
> claimant's reliable evidence, including the opinions of a treating
> physician. But, we hold, courts have no warrant to require
> administrators automatically to accord special weight to the
> opinions of a claimant's physician; nor may courts impose on plan
> administrators a discrete burden of explanation when they credit
> reliable evidence that conflicts with a treating physician's
> evaluation.

Id. at 834.

The Trustees met their obligation in this case.  It is evident from the record that the

Trustees considered all the evidence submitted by Mr. Carpenter.  In the Trustees' assessment,

however, Mr. Carpenter and Dr. Santioni did not submit any objective evidence indicating that

he cannot perform useful duties.  Indeed, the functional capacity statements submitted by Dr.

Santioni actually indicated that Mr. Carpenter could perform useful duties, such as occasionally

sitting, walking, keyboarding, lifting and using his hands to grasp light objects.  (See, e.g., AF

(Dkt. Entry 12-1, Ex. C) at 19)  These results were nearly identical to the results of the

independent 2002 FCE reviewed by Dr. Kline.  (Id. at 47.)

The Trustees' decision to accept Dr. Kline's opinion over Dr. Santioni was not arbitrary

and capricious, even under the heightened scrutiny standard applied here.  The medical

evidence in this case is sharply conflicted, and deference to the Trustees' determination in the

face of that conflict must be respected.  See Leahy v. Ratheon Co., 315 F.3d 11, 18-19 (1st Cir.

2002).  The fact that Dr. Kline is an outside doctor and that his opinion was supported by other medical professionals (the certified evaluator who conducted the FCE and the Medical Review Officer at the Mehoopany Plant) substantiates the conclusion that the Trustees did not act arbitrarily.  See Grossman v. Wachovia Corp., No. Civ.A. 04-3701, 2005 WL 2396793, at *8 (E.D. Pa. Sept. 27, 2005).

Finally, Mr. Carpenter asserts that there was insufficient evidence to support the Trustees' determination.  (Pl.'s Br. in Opp. to Def.'s Mot. Summ. J. (Dkt. Entry 56-1) at 9-12.)  In this regard, Mr. Carpenter argues the results of the 2002 FCE were unreliable.  (Pl.'s Br. in Opp. to Def.'s Mot. Summ. J. (Dkt. Entry 56-1) at 10.)  Dr. Kline, however, actually assessed the results as "consistent" and "use[ful] to assist with medical and vocational planning."  (AF (Dkt. Entry 12-2) at 45.)  Moreover, the results of the 2002 FCE are consistent with the results of the capacity statements submitted by Dr. Santioni.  (Compare id. at 47, with id. at 19.)  Thus, the Trustees' reliance on the 2002 FCE is not refuted by the evidence in the record.

As noted above, a Court should overturn a Trustees' decision "only if it is clearly not supported by the evidence in the record."  See Vitale v. Latrobe Area Hosp., 420 F.3d 278, 282 (3d Cir. 2005).  Such a determination cannot be made here.

Mr. Carpenter also argues that the Trustees failed to consider a report by a P&G plant physician, which included a notation stating "Total Disability."  (Pl.'s Br. in Opp. to Def.'s Mot. Summ. J. (Dkt. Entry 56-1) at 11.)  It is unclear from the record whether this was a medical

opinion or a note that Mr. Carpenter was on total disability.  It is clear, though, that the report does not include any significant analysis of the degree of Mr. Carpenter's limitations or ability to perform useful duties.  Thus, even if the notation was an assessment of Mr. Carpenter's capabilities, it fails to provide clear evidence that Mr. Carpenter was totally disabled.

The issue before this Court is whether the Trustees acted arbitrarily and capriciously when they determined that Mr. Carpenter was not totally disabled, while bearing in mind that the Trustees have a slight conflict of interest.  The facts pertinent to this determination are undisputed.  The Trustees' decision was rationally rooted in medical evidence.  Therefore, Defendant's motion for summary judgment will be granted.

## IV.  CONCLUSION

For the reasons stated above, this Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment.  An appropriate order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GARY CARPENTER :
          PLAINTIFF :
     :          3:CV-03-0399
    VS. :       (CHIEF JUDGE VANASKIE)
     :
PROCTOR & GAMBLE DISABILITY :
BENEFIT PLAN & BENEFIT PLANS :
TRUST :
        DEFENDANT :

## ORDER

NOW, THIS 31st DAY OF MARCH, 2006, in accordance with the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT**:

    1. Defendant's motion for summary judgment (Dkt. Entry 52-1) is **GRANTED**.

    2. Plaintiff's motion for summary judgment (Dkt. Entry 50) is **DENIED**.

    3. The Clerk of Court is directed to enter judgment in favor of Defendant and to mark this

matter **CLOSED**.

                           s/ Thomas I. Vanaskie
                           Thomas I. Vanaskie, Chief Judge
                           Middle District of Pennsylvania